IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>STEVEN RANDALL FARR,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER OVERRULING OBJECTIONS**<br><br>Case No. 2:05-cr-00029-TC-DBP<br><br>Judge Tena Campbell<br>Magistrate Judge Dustin B. Pead |

Before the court are objections filed by Defendant Steven Randall Farr and his wife, Tammy Farr, to two oral orders addressing several motions to quash issued by the Honorable Dustin B. Pead. The court finds that Judge Pead committed no legal error and that his rulings were not clearly erroneous—indeed, the court finds that his ruling was a reasonable resolution of what has been a complicated proceeding. For the reasons further explained below, the court therefore overrules the objections.

## BACKGROUND

On January 10, 2006, the court sentenced Mr. Farr to 27 months in custody and a 3-year term of supervised release after he pled guilty to one count of the sale of unregistered securities in violation of 15 U.S.C. § 77e(c). (Judgment, ECF No. 44 at 1.) The court also ordered that Mr. Farr pay $1,313,914.77 in restitution to approximately 50 victims of his crime. (Id. at 3; Restitution List, ECF No. 45.) In exchange for his guilty plea, the United States agreed to dismiss 17 other counts of the indictment. (See ECF No. 44 at 1; Min. Entry, Jan. 10, 2006, ECF No. 43.) In his statement accepting responsibility for his actions (for which he received a downward adjustment of his offense level and a lower guideline sentencing range), Mr. Farr

acknowledged that his restitution payments would last for many years: "My desire now is to be able to repay the individuals involved, which I realize will be a life-time effort." (PSR, Ex. F to Gov't Resp. Mot. Quash, ECF No. 123-6 at ¶ 10.) To that end, Mr. Farr signed a stipulation on January 24, 2011—at the end of his term of supervised release—agreeing to monthly payments of $150 and the submission of yearly financial statements, with an understanding that his future payment schedule would be evaluated and potentially modified based on his financial status. (Stip. Mot. Installment Payments, ECF No. 50 at ¶ 2.)

But shortly thereafter, due to the inclusion of an incorrect statutory reference in Mr. Farr's plea agreement, the government stopped collecting restitution payments and filed a Certificate of Release of Lien with the Utah County Recorder on July 20, 2011, in which it stated that the requirements of 18 U.S.C. § 3613(a) had been satisfied. (See Release of Lien, Ex. B to Def.'s Opp'n Mem., ECF No. 82-2.) Although he had only paid around $12,500 of the $1.3 million restitution order, Mr. Farr understandably believed that he was off the hook for future payments.

Nine years later, the United States changed its position after receiving an email from one of the victims of Mr. Farr's securities scheme. The email read as follows:

> Steve [Farr] happens to live about 1 mile from my home in a nice home of his own. … On Saturday, May 16, 2020, I drove by his home … and was surprised to see a nice truck and a new looking boat in the driveway (see attached photo). It made me wonder what the status was of his restitution payments so I called … and asked. It turns out that he has only paid about $12,000 in restitution (that's less than he stole from me personally). …
>
> …
>
> As you can appreciate, I have had to deal with the pain and anger related to being cheated by Steve Farr. For the most part it is gone. But seeing him have "toys" that he really shouldn't be able to afford if he were paying people back brings some old feelings to the surface.

(Email, May 20, 2020, Ex. A to Gov't Resp. Mot. Quash, ECF No. 123-1.)

Prompted by this email, and after looking into the status of Mr. Farr's restitution payments, the United States determined that its decision to stop collecting these payments in 2011 was an error. The government sent Mr. Farr a letter dated May 21, 2020, in which it explained the mistake and asked Mr. Farr to "agree to an installment payment order based upon [his] current financial situation." (Letter from Allison Moon to Steven Farr, May 21, 2020, Ex. A to Mot. Order Show Cause, ECF No. 65-1 at 19–20.) The government then served Mr. Farr with a subpoena on August 26, 2020, asking for financial statements and other documents related to the boat that had prompted the victim's email. (Subpoena to Steven Farr, Aug. 26, 2020, Ex. A to Mot. Order Show Cause, ECF No. 65-1 at 7–16.) Mr. Farr disputed that the restitution order remained valid and objected to the subpoena. (Obj. to Subpoena, Sept. 30, 2020, Ex. A to Mot. Order Show Cause, ECF No. 65-1 at 2–6.) As a result, the United States filed a motion for an order to show cause asking the court to declare the validity of the restitution order and directing Mr. Farr to respond to the subpoena. (Mot. Order Show Cause, ECF No. 65.)

That motion prompted several years of litigation, which was prolonged in part because of Mr. Farr's health. (See Order Granting Stip. Mot. Extend Time, Dec. 18, 2020, ECF No. 69; Not. Update Regarding Def.'s Health Condition, Feb. 1, 2021, ECF No. 71.) After a status conference on May 2, 2023, the court referred the motion to Magistrate Judge Dustin B. Pead under 28 U.S.C. § 636(b)(1)(B). Judge Pead issued a Report and Recommendation (R&R) in which he found that the restitution order remained valid despite the government's missteps. (R&R, July 26, 2023, ECF No. 94 at 7.) The court adopted the R&R over Mr. Farr's objections and held that, despite the government's citation to the incorrect statute in the plea agreement, the court nevertheless "had the authority to order restitution under 18 U.S.C. § 3663(a)(3) and, under

18 U.S.C. § 3613, the restitution order remains in force until January 23, 2028." (Order Adopting R&R, June 25, 2024, ECF No. 100 at 6–7.) The court then ordered Mr. Farr to respond to the subpoena and provide the requested financial information. (Id. at 8–9.)

The United States filed a second motion for an order to show cause alleging that Mr. Farr failed to comply with the court's order. (Second Mot. Order Show Cause, ECF No. 102.) Judge Pead held a series of hearings and denied the motion after he found that Mr. Farr eventually demonstrated substantial compliance with the subpoena. (Min. Entry, Aug. 5, 2024, ECF No. 107; Min. Entry, Aug. 22, 2024, ECF No. 110; Min. Entry, Sept. 3, 2024, ECF No. 113.) But Mr. Farr's responses to the subpoena, as well as arguments he made about his wife's responsibility for many of the couple's household expenses, raised additional concerns for the government as it attempted to gain a complete picture of Mr. Farr's finances.

The government sought more information in five areas. First, the United States issued a subpoena to Native Rayz LLC (Native Rayz) on August 15, 2024. (Subpoena to Native Rayz, Ex. A to Tammy Farr's Mot. Quash, ECF No. 117-1 at 6–9.) Native Rayz is a limited liability company whose sole member is Mrs. Farr and whose assets include the boat that initiated the renewed interest in Mr. Farr's restitution, a Tige 2019 worth approximately $137,000, and two motorcycles. (Hr'g Tr., Nov. 19, 2024, ECF No. 150 at 42; Boat Listing, Ex. C to Gov't Resp. Mot. Quash, ECF No. 123-3 at 3–4; Title Certificate, Ex. H to Gov't Resp. Mot. Quash, ECF No. 123-8.) Also on August 15, 2024, the United States issued a subpoena to Sunrise Trust (the Trust). (Subpoena to Sunrise Trust, Ex. A to Tammy Farr's Mot. Quash, ECF No. 117-1 at 2–5.) The Trust's assets include the joint residence at which the Farrs reside, but which Mrs. Farr alleges is her sole property. (Hr'g Tr. at 42–43; Sunrise Trust, Ex. G to Gov't Resp. Mot. Quash, ECF No. 123-7.) Third, the United States issued a subpoena to Mrs. Farr on September 3, 2024,

asking for documents related to Mrs. Farr's finances. (Subpoena to Tammy Farr, Ex. A to Tammy Farr's Mot. Quash, ECF No. 117-1 at 10–13.) Fourth, the government issued an additional subpoena to Mr. Farr on September 9, 2024, asking for financial documents stretching back to 2005. (Subpoena to Steven Farr, Ex. A to Mot. Quash, ECF No. 116-1.) Finally, the United States issued a subpoena to Sekoya Reserve, a sole proprietorship owned and operated by Mr. Farr. (Subpoena to Sekoya Reserve, Ex. C to Gov't Resp. Sekoya Mot. Quash, ECF No. 132-3.) In his disclosures responding to the first subpoena, Mr. Farr listed a monthly income of $6,234 ($5,101 in wages and $1,133 in net business income) and stated that the Sekoya Reserve had $332,000 in inventory (as well as $15,000 in inventory purchased by not yet received). (Financial Statement Form, Ex. A to Gov't Resp. Sekoya Mot. Quash, ECF No. 132-1.)

The Farrs filed several motions relating to these subpoenas. Mr. Farr filed a motion to quash the subpoena addressed to him. (ECF No. 116.) He later filed an additional motion to quash the subpoena addressed to Sekoya Reserve. (ECF No. 127.) Finally, Mrs. Farr filed a motion to quash the subpoenas addressed to her, Native Rayz, and the Trust. (ECF No. 117.)

Judge Pead held two hearings on these motions, on November 19, 2024, and November 22, 2024. (Min. Entry, Nov. 19, 2024, ECF No. 135; Min. Entry, Nov. 22, 2024, ECF No. 138.) In the first hearing, Judge Pead ruled on the motions filed by Mr. Farr and Sekoya Reserve, and partially addressed Mrs. Farr's motion as it related to the subpoena against the Trust. Judge Pead addressed the remaining issues raised by Mrs. Farr and Native Rayz in the second hearing.

Judge Pead noted that while the government had made some misstatements, "their misstatements didn't allow for the validity of the restitution order to be impacted. In other

words, it remained there. It didn't—[Mr. Farr] wasn't making payments on it." (Hr'g Tr. at 56.) While Judge Pead did not discuss default, he noted that Mr. Farr was "receiving the benefit of not making payments on [the restitution order], but it didn't mean that it wasn't valid because it hadn't expired. It was subject to some dispute." (Id.) And Judge Pead found that the government could appropriately ask the Farrs about some of their assets:

> It does strike me now that there is a reasonable ground to believe that there were assets that [Mr. Farr] could—that could have been obtained to help make restitution. He could have made the victims more whole than—certainly than they are now. So I think Judge Campbell's order is not just limited strictly to what's his current ability. I think it does allow for some historical analysis.

(Id. at 57.) Specifically, he found that "Mr. Farr has obtained a benefit from Sekoya. I think that's fair game historical, and I think that's fair game current." (Id. at 58.) Finally, Judge Pead noted that it was "fair to say that [Mr. Farr] put his wife a little bit in play when he talked about some of the assets, things that could be fairly considered by the United States in determining his current assets, his current ability to pay." (Id. at 57.) Although Judge Pead had "a little bit more empathy for [Mrs. Farr's] situation," he found that the government's requested discovery was relevant to the determination of an appropriate installment plan. (Id.)

But Judge Pead did put some limits on the government's requests. Most notably, he disagreed with the government that it could seek records of all stocks, securities, and bonds bought and sold by Mr. Farr since 2005. (Id. at 59.) Instead, he limited that discovery to transactions that occurred since January 1, 2020. (Id.) He found that date appropriate because it was relevant to "the state of mind of Mr. Farr" in the months before Mr. Farr received the government's May 21, 2020 letter. (Id. at 60.) Judge Pead noted that "there may be documents that reflect transfer of assets or availability of assets as of January 1, 2020." (Id.)

6

In the hearing on November 22, 2024, Judge Pead addressed the subpoenas issued to Mrs. Farr and Native Rayz.[1] Relevant to Mrs. Farr's objections, Judge Pead ordered her to provide documents related to a trust that she created for a small inheritance she received from her mother. At the hearing, her counsel related Mrs. Farr's concern that the government would take that inheritance even though it was her separate property and Mr. Farr was not a beneficiary. Judge Pead noted that Mrs. Farr's separate property was not accessible to the government for the purposes of enforcing a restitution order against Mr. Farr but found that discovery about her financial resources was nevertheless relevant because it affected Mr. Farr's current ability to pay the restitution order. Judge Pead also ordered Mrs. Farr to provide documents recording the transfer of any greater than $10,000 since January 1, 2019. That order limited the government's original request for all records of any transfers for the past 10 years. Mrs. Farr's counsel requested that the time period be further limited to transfers from January 1, 2020, but Judge Pead found that the creation of Native Rayz in 2019, which was formed to hold the boat, made the earlier date more appropriate.

## LEGAL STANDARD

The parties do not dispute that under Rule 72(a) of the Federal Rules of Civil Procedure, the district judge must consider timely objections to a magistrate judge's nondispositive ruling and modify or set aside any part of the order that is "clearly erroneous or is contrary to law." Fed. R. Civ. P. 72(a). To overturn a magistrate judge's decision as clearly erroneous, the court must have a "definite and firm conviction that a mistake has been committed." Ocelot Oil Corp. v. Sparrow Indus., 847 F.2d 1458, 1464 (10th Cir. 1988) (quotation omitted).

---

[1] Although Mrs. Farr objected to certain aspects of Judge Peal's ruling, she did not order or provide the court with a transcript of the November 22, 2024 hearing. The court has instead listened carefully to a recording of the Zoom proceeding.

## ANALYSIS

As a preliminary clarification, the Farrs have not objected to Judge Pead's rulings on the motions to quash the subpoenas addressed to Native Rayz and the Trust. Accordingly, the court addresses the Farrs' objections to Judge Pead's rulings on the motions to quash the subpoenas addressed to Mr. Farr, to Sekoya Reserve, and to Mrs. Farr.

### I.   Objections Concerning the Subpoena Addressed to Mr. Farr

Judge Pead held that Mr. Farr must respond to discovery requests to produce "documentation of all stocks, securities, and bonds bought and sold since January 1, 2020," records of any LLC or trust in which he has an interest or from which he received benefits from January 1, 2020, to the present, and tax returns from 2019 to 2022. (Hr'g Tr. at 58–59; see also Def.'s Objs., ECF No. 142 at 7.) Mr. Farr objects to these rulings on the ground that Judge Pead based his decision on multiple material factual errors.[2]

To begin, the court notes that both the Farrs and the United States have mischaracterized the court's previous order. The Farrs maintain that Judge Pead incorrectly "concluded that the restitution case remained valid at all times …." (ECF No. 142 at 7.) But Judge Pead was correct: the restitution order was always valid. In its previous order, the court held as follows:

> The court finds that Mr. Farr reached an agreement with the United States about restitution that was an integral part of his plea agreement and was not negated by the government's citation to the incorrect statute. Therefore, the court had the authority to order restitution under 18 U.S.C. § 3663(a)(3) and, under 18 U.S.C. § 3613, the restitution order remains in force until January 23, 2028.

---

[2] Mr. Farr also cites legal errors in his objections (see ECF No. 142 at 12–16), but those errors are only relevant to the subpoenas addressed to Sekoya Reserve and Mrs. Farr. The court addresses those objections below.

(ECF No. 100 at 6–7.) The confusion—leading to the extremely unusual circumstances of this case—arises because the government did not <u>enforce</u> the otherwise valid restitution order from 2011 to 2020. That mistake did not affect the validity of the order.

But that mistake does mean that Mr. Farr was not in default, as the United States has argued. (<u>See</u> Gov't Resp. to Objs., ECF No. 149 at 3 ("On May 21, 2020, the U.S. Attorney's Office sent Defendant a letter notifying him of his default on restitution payments ….").) Mr. Farr remained under a restitution obligation, but he was understandably unaware of that fact. And there is no evidence that Mr. Farr failed to comply with any obligations of an installment payment plan, because no such plan has been in place since 2011. The court therefore disagrees that Mr. Farr was in default.

Even so, the court is unpersuaded that the government's characterization of Mr. Farr's status had an effect on Judge Pead's ruling. Mr. Farr himself admits that "the Magistrate Judge did not use the term 'default'" (ECF No. 142 at 8), and the court disagrees that Judge Pead's ruling was based in any way on a finding of default or bad faith. Judge Pead recognized that Mr. Farr received a benefit from the nine years during which the government failed to enforce the restitution order, but never suggested that Mr. Farr was at fault for the government's error.

To the extent that Judge Pead allowed for some "historical analysis" about assets that Mr. Farr might use to make restitution payments, he limited discovery about those assets to January 1, 2020—in other words, a few months before the United States put Mr. Farr on notice that he remained under the restitution obligation. The court agrees that Mr. Farr's state of mind at that time was relevant, and that his current ability to pay may be affected by financial transactions that occurred at the time he discovered that he still owed restitution.

9

Indeed, this long tangle of litigation was kickstarted due to the Farrs' purchase of a boat in 2019, which someone (contact specified as "steve") then advertised for sale for $137,000 on a site with a listing expiration date of July 7, 2020. (ECF No. 123-3 at 3–4.) Judge Pead's order does not authorize a fishing expedition of discovery through Mr. Farr's finances during the 9-year period when the government failed to enforce the restitution order. Instead, the authorized discovery is tied to the time period relevant to the first subpoena issued by the United States—with which Mr. Farr refused to comply in 2020—and continuing through today.

The court also disagrees with Mr. Farr that other misrepresentations made by the United States had any effect on Judge Pead's ruling, let alone rendered that ruling clearly erroneous. First, Mr. Farr points to evidence that the government placed a lien on the home he shares with Mrs. Farr, even though the government indicated otherwise to Judge Pead. The court has concerns with this lien, which it addresses below, but finds that any misrepresentations about the lien do not affect a determination of whether the discovery ordered by Judge Pead was irrelevant, overbroad, or unduly burdensome. Similarly, the court is not concerned (nor did Judge Pead discuss) whether an August 26, 2020 subpoena required Mr. Farr to testify or merely produce documents. And Judge Pead did not base his ruling on a finding that Mr. Farr was trying to hide the boat because it was registered in Montana.

Finally, Mr. Farr argues that the government incorrectly characterizes a loss of $109,000 that the Farrs reported to the IRS on a 2023 tax return as a capital gain that Mr. Farr failed to disclose. (ECF No. 142 at 11.) This argument misses the mark. Regardless of whether the Farrs reported capital losses or gains, a loss of that magnitude—even if the loss included carry-overs from previous years, as Mr. Farr maintains (see id. at 11 n.2)—suggests that the Farrs may possess substantial capital assets. After all, capital losses are generally realized when an asset is

10

sold. Say the Farrs purchased certain stocks for $1 million many years ago and then sold them for $900,000. That sale would result in a capital loss of $100,000, but the Farrs would still have $900,000 in cash from the proceeds of the sale.[3] In addition, losses from the sale of some assets are often used to offset gains from the sale of other assets. Further discovery about why the Farrs reported these capital losses is therefore relevant, proportional, and not unduly burdensome to provide information that is necessary for the government to agree to an appropriate payment plan.

For these reasons, the court finds that Judge Pead's ruling was not clearly erroneous. Over the government's objection, Judge Pead appropriately limited the scope of discovery concerning Mr. Farr's financial records to January 1, 2020—a timeframe that is relevant to the original subpoena propounded on Mr. Farr, that extends only a few months before the date on which Mr. Farr received notice that the restitution order remained valid, and that is proportional to the needs of the case based on Mr. Farr's responses to the first subpoena.

## II.     Objections Concerning the Subpoena Addressed to Sekoya Reserve

Judge Pead ruled that Mr. Farr must also provide financial information about Sekoya Reserve, finding that "there's reasons to believe that Mr. Farr has obtained a benefit from Sekoya." (Hr'g Tr. at 58.) He therefore denied the motion to quash but limited the discovery of certain categories of information (items 4, 5, and 7 on Attachment A of the subpoena, see ECF No. 132-3 at 4) to January 1, 2020.

---

[3] The court cannot find where, if anywhere, either the United States or the Farrs provided the court with the relevant tax return indicating capital losses of $109,000. Having not seen either the Form 1040 or any attached Schedule D, the court provides the above examples only as an illustration.

For the reasons stated above, the court finds that the temporal limitation is appropriate, relevant, and allows for discovery that is not unduly burdensome or disproportionate to the needs of the case. But Mr. Farr further argues that Judge Pead's ruling is contrary to law. Specifically, Mr. Farr asserts that Judge Pead did not consider the heightened showing of relevance necessary to obtain discovery from non-parties and did not make adequate findings about whether Sekoya Reserve is an alter ego of Mr. Farr, such that the court would be justified in piercing the corporate veil.

The court finds these arguments unpersuasive. The United States may enforce an order of restitution as if it were a lien or judgment. See 18 U.S.C. §§ 3664(m)(1)(A), 3613(f). As a result, the United States may use civil discovery to discover assets and other information relevant to the collection of the debt. E.g., United States v. Thomas, 165 F. Supp. 3d 992, 995 (D. Colo. 2015) ("[T]he government may have discovery regarding the financial condition of the debtor … in the same manner in which discovery is authorized under the Federal Rules of Civil Procedure in an action on a claim for a debt."). And Rule 26 of the Federal Rules of Civil Procedure allows the United States to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case …." Fed. R. Civ. P. 26(b)(1).

Some courts have adopted a heightened relevancy standard for discovery from nonparties in the context of the execution of a judgment. See, e.g., Mountain Dudes, LLC, v. Split Rock, Inc., No. 2:08-cv-940-CW, 2013 WL 5435707 (D. Utah Sept. 29, 2013); see also Fed. R. Civ. P. 69(a)(2) (allowing a judgment creditor to "obtain discovery from any person—including the judgment debtor—as provided in these rules or by the procedure of the state where the court is located"). As Mr. Farr points out, the Honorable Clark Waddoups has held that "courts permit such discovery against nonparties where the creditor makes a heightened showing of necessity

and relevance—i.e., at least some demonstration of concealed or fraudulent transfer or alter ego relationship with the judgment debtor." Mountain Dudes, LLC, 2013 WL 5435707, at *8 (cleaned up).

But even if the court were to adopt this heightened standard, the United States has carried its burden. Applying that heightened standard, Judge Waddoups provides examples where such nonparty discovery is appropriate, for instance "where a creditor raises a colorable suspicion that the nonparty is a mere extension of a debtor's business operations." Id. (cleaned up). Here, Sekoya Reserve is a business that appears to be solely owned and operated by Mr. Farr. Even if there are other owners, Mr. Farr admits that "he has an interest in Sekoya" and that Sekoya Reserve's records may "implicate his personal finances[.]" (ECF No. 127 at 4 (asserting that Mr. Farr has standing to quash to the subpoena against Sekoya Reserve).) Further, Mr. Farr and his wife are both listed on Sekoya Reserve's business checking account at Utah Community Credit Union (see Sekoya Reserve Bank Records, Ex. E to Gov't Resp. Sekoya Mot. Quash, ECF No. 132-5) and state business records indicate that Mr. Farr is Sekoya Reserve's registered agent and sole principal (see Sekoya Reserve Business Registration, Ex. D to Gov't Resp. Sekoya Mot. Quash, ECF No. 132-4). It is difficult to imagine an instance where a nonparty is more closely tied to a debtor, especially given that Mr. Farr's monthly income appears to be generated entirely from Sekoya Reserve. Indeed, Sekoya Reserve has never hired its own counsel or disputed the obvious inference that Mr. Farr maintains substantial control over the business. And the government is entitled to obtain discovery about assets controlled by Mr. Farr for the purpose of determining Mr. Farr's ability to pay. See, e.g., 18 U.S.C. § 3664(d)(3) (requiring a defendant to file a "complete listing of all assets owned or controlled by the defendant" when the court first orders restitution (emphasis added)).

13

Given these substantial ties, the government need not demonstrate that Sekoya Reserve is an alter ego of Mr. Farr before obtaining this discovery. A finding of alter ego is more relevant to a determination of whether the government may attach Sekoya Reserve's assets to satisfy Mr. Farr's restitution obligation. But information about Mr. Farr's business, which pays Mr. Farr the only wages he has reported, is clearly relevant to the determination of an appropriate installment plan. And even if the government sought information solely to support an alter ego theory, the court finds that "the relationship between the judgment debtor and the nonparty is sufficient to raise a reasonable doubt about the bona fides of the transfer of assets between them." Magnaleasing, Inc. v. Staten Island Mall, 76 F.R.D. 559, 562 (S.D.N.Y. 1977) (permitting discovery against a nonparty to a judgment where the same individuals control both the judgment debtor and the third party).

Accordingly, the court finds that Judge Pead's ruling on the motion to quash the subpoena addressed to Sekoya Reserve is not clearly erroneous or contrary to law.

### III.     Objections Concerning the Subpoena Addressed to Mrs. Farr

Mrs. Farr objects to two aspects of Judge Pead's oral ruling on November 22, 2024. First, she disputes that she must provide discovery about the existence of a trust that contains what Mrs. Farr refers to as a "small amount of inheritance [she] received from her mother." (Tammy Farr Objs., ECF No. 144 at 4.) Second, she objects to providing documents recording the transfer of assets greater than $10,000 from January 1, 2019, until the present. (Id. at 5.)

The court finds nothing in Judge Pead's ruling that was clearly erroneous or contrary to law. Judge Pead found that Mr. Farr "put his wife a little bit in play" through his subpoena and other responses, in which Mr. Farr asserted that many of the couple's shared finances, such as the ownership of the house and the payment of household expenses, were controlled by Mrs.

Farr. (Hr'g Tr. at 57.) While property held solely by Mrs. Farr is not available for the government to use to satisfy Mr. Farr's restitution order, her general financial condition is relevant to Mr. Farr's ability to pay. Limited discovery about the existence of trusts for which Mrs. Farr is a beneficiary is therefore appropriate.[4] And any transfer of assets over $10,000 is relevant to the couple's overall financial condition—and potentially to Mr. Farr's joint or sole property. Judge Pead limited discovery on this request to asset transfers from January 1, 2019—one year more than the timeframe which the court has determined was appropriate for discovery into Mr. Farr's security assets. Because this additional year of discovery is targeted only to large asset transfers and covers the period when the Farrs purchased the boat, the court agrees with Judge Pead that the discovery is relevant and not unduly burdensome—even if the court were to require a heightened showing of necessity and relevancy. See Mountain Dudes, LLC, 2013 WL 5435707, at *8.

The court also agrees with the government that the court may consider a spouse's assets when ordering an amended installment plan for a restitution order. See, e.g., United States v. Totaro, 91 F.4th 1263, 1266 (8th Cir. 2024) (holding that the district order did not abuse its discretion when ordering a defendant to pay 88% of his Social Security income towards restitution because he shared substantial assets with his wife—including "their home, a $45,000 vehicle, and over $80,000 in savings"—even though those assets were in the wife's name only).

Mrs. Farr argues that the government's reliance on Totaro is misplaced because that case concerned a defendant who had defaulted on his restitution obligations. Id. As the court has noted above, Mr. Farr was not in default because both he and the government believed that his

---

[4] Mrs. Farr's counsel maintained that the existence of the inheritance trust was protected by attorney-client privilege, but the court has found no authority to support this assertion.

restitution order was no longer enforceable. But <u>Totaro</u> remains persuasive because the relevant portion of the ruling concerns the reasonable of a restitution order "even if there was a material change in circumstances" under 18 U.S.C. § 3664(k), and not just a finding of default under 18 U.S.C. § 3613A. <u>Id.</u> Although the circumstances here are unique, Mr. Farr's situation can best be analogized to a material change in circumstances: after reducing Mr. Farr's monthly payment to nothing for nine years, the United States (prompted by a victim) provided the court with "notification of a material change in the defendant's economic circumstances …." 18 U.S.C. § 3664(k). That material change was suggested by the expensive boat in Mr. Farr's driveway. And in these circumstances, "the court may, on its own motion, or the motion of any party, including the victim, adjust the payment schedule, or require immediate payment in full, as the interests of justice require." <u>Id.</u> The court finds <u>Totaro</u> persuasive for the proposition that the district court may consider a spouse's assets (where a defendant shares the benefit of those assets, such as by living in the same house) when the United States has presented evidence of a material change in the defendant's economic circumstances and the court must determine whether to require immediate payment in full or adopt a reasonable repayment schedule for an unpaid restitution order.

**IV. Lien**

At the hearing on November 19, 2024, the United States rejected a suggestion that it had placed a lien on Mrs. Farr's home: "What the United States did is record a lien with respect to Mr. Farr and we are required to put an address on that lien." (Hr'g Tr. at 49.) But Mrs. Farr has provided the lien, and it does appear that the lien lists Mrs. Farr's home not only as Mr. Farr's residence but also in the legal description of the property to which the lien attaches. (Lien, Ex. A

16

to Tammy Farr Objs., ECF No. 144-1.) The United States did not address the lien in its response to Mrs. Farr's objections.

The United States does not appear to object to Mrs. Farr's assertion that the residence is her sole property. Accordingly, the court orders the government to respond to Mrs. Farr's concerns about the lien and to record a corrected lien if necessary.

### V.  Conclusion

Mr. Farr owes a debt to the victims of his crime, and he has only ever repaid a tiny fraction of that debt. At the same time, the government's missteps have created unnecessary uncertainty for Mr. Farr and his family. While the government is correct that financial documents stretching back to 2005 may be relevant to Mr. Farr's ability to pay his restitution, the government's request for such extensive discovery overlooks the unusual circumstances of this case. Judge Pead reasonably and lawfully balanced these concerns by allowing for discovery about Mr. Farr's financial resources (including his business, Sekoya Reserve) from January 1, 2020, a date only a few months before Mr. Farr was put on notice about the government's belief—eventually confirmed by this court—that the restitution order remained valid. And the court finds nothing clearly erroneous or contrary to law about Judge Pead's decision to permit targeted discovery into the financial resources and activities of Mr. Farr's wife.

The court ordered the parties to develop an appropriate payment plan on June 25, 2024. Nearly eight months later, there is no plan in place. The court reminds the United States that it need not uncover every piece of Mr. Farr's financial history to propose an appropriate plan. If the United States can show that Mr. Farr has failed to provide relevant information, the court may draw inferences against him when determining a payment amount.

The court also reminds Mr. Farr that, even though he is not in default, he nevertheless owes approximately $1.3 million. If he does not believe he can repay that amount in full, he must provide the United States with an accurate picture of his financial circumstances.

The court is hopeful that the parties can work together to develop an appropriate payment plan. But given the lengthy delays in this matter, the court is not inclined to allow further discovery or motion practice. The Farrs must respond to the subpoenas within 14 days; the court will then allow the United States two weeks to determine whether the responses are sufficient to agree to a payment plan. If the parties are unable to agree, the court will set an evidentiary hearing. The court notes that, under 18 U.S.C. § 3771, the court must "make every effort to permit the fullest attendance possible" by the victims of Mr. Farr's crime; the court will therefore direct the United States to notify victims of the hearing and will consider whether the court should allow testimony from those victims.

**ORDER**

For the foregoing reasons, the court orders as follows:

1. The court OVERRULES the objections to Judge Pead's two oral rulings (ECF Nos. 142 & 144).

2. Mr. and Mrs. Farr must respond to the subpoenas within 14 days from the date of this order.

3. The United States must file a status report within 14 days from receiving the subpoena responses. That report shall state whether the United States believes that the Farrs have complied with the subpoenas, whether important financial information remains missing, and whether the parties have reached an agreement about an appropriate payment plan. The report must also respond to Mrs. Farr's concerns about the lien on her house.

DATED this 14th day of February, 2025.

BY THE COURT:

_____
Tena Campbell
United States District Judge