IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>STEVEN RANDALL FARR,<br><br>Defendant. | MEMORANDUM DECISION AND ORDER SETTING RESTITUTION PAYMENT SCHEDULE AND DENYING MOTION TO APPOINT RECEIVER<br><br>Case No. 2:05-cr-00029-TC-DBP<br><br>Judge Tena Campbell<br>Magistrate Judge Dustin B. Pead |

In this long-standing dispute over restitution, the United States moves the court to establish a payment schedule under 18 U.S.C. § 3664(k) and to appoint a receiver. (ECF No. 159.) The government argues that a receivership is necessary to divest Defendant Steven Randall Farr of his business assets in satisfaction of his outstanding restitution judgment. For the following reasons, the court declines to appoint a receiver but instead sets a payment schedule of $2,000 per month, which the court finds is reasonable and accounts for Mr. Farr's ability to pay.

## BACKGROUND

In its order overruling certain objections to discovery rulings filed by Mr. Farr and his wife, Tammy Farr, the court included a detailed history of this case. (Mem. Decision & Order, Feb. 14, 2025, ECF No. 154 at 1–7.) For completeness, the court repeats the relevant aspects of that case history here.

On January 10, 2006, the court sentenced Mr. Farr to 27 months in custody and a 3-year term of supervised release after he pled guilty to one count of the sale of unregistered securities in violation of 15 U.S.C. § 77e(c). (Judgment, ECF No. 44 at 1.) The court also ordered that Mr.

1

Farr pay $1,313,914.77 in restitution to approximately 50 victims of his crime. (Id. at 3; Restitution List, ECF No. 45.) In exchange for his guilty plea, the United States agreed to dismiss 17 other counts of the indictment. (See ECF No. 44 at 1; Min. Entry, Jan. 10, 2006, ECF No. 43.) In his statement accepting responsibility for his actions (for which he received a downward adjustment of his offense level and a lower guideline sentencing range), Mr. Farr acknowledged that his restitution payments would last for many years: "My desire now is to be able to repay the individuals involved, which I realize will be a life-time effort." (Presentence Report (PSR), Ex. F to Gov't Resp. Mot. Quash, ECF No. 123-6 at ¶ 10.) To that end, Mr. Farr signed a stipulation on January 24, 2011—at the end of his term of supervised release—agreeing to monthly payments of $150 and the submission of yearly financial statements, with an understanding that his future payment schedule would be evaluated and potentially modified based on his financial status. (Stip. Mot. Installment Payments, ECF No. 50 at ¶ 2.)

But shortly thereafter, due to the inclusion of an incorrect statutory reference in Mr. Farr's plea agreement,[1] the government stopped collecting restitution payments and filed a Certificate of Release of Lien with the Utah County Recorder on July 20, 2011, in which it stated that the requirements of 18 U.S.C. § 3613(a) had been satisfied. (See Release of Lien, Ex. B to Def.'s Opp'n Mem., ECF No. 82-2.) Although he had only paid around $12,500 of the $1.3 million restitution order, Mr. Farr believed that he was relieved of any obligation to make future payments.

---

[1] The plea agreement cited 18 U.S.C. § 3663A, which is a provision of the Mandatory Victims Restitution Act of 1996. (Statement in Advance of Plea, ECF No. 29 at 2.) The agreement should have instead referenced 18 U.S.C. § 3663(a), a provision of the Victim Witness Protection Act of 1982, which provides that the court may "order restitution in any criminal case to the extent agreed to by the parties in a plea agreement." 18 U.S.C. § 3663(a)(3).

2

Nine years later, the United States changed its position after receiving an email from one of the victims of Mr. Farr's securities scheme. The email read as follows:

> Steve [Farr] happens to live about 1 mile from my home in a nice home of his own. … On Saturday, May 16, 2020, I drove by his home … and was surprised to see a nice truck and a new looking boat in the driveway (see attached photo). It made me wonder what the status was of his restitution payments so I called … and asked. It turns out that he has only paid about $12,000 in restitution (that's less than he stole from me personally). …
>
> …
>
> As you can appreciate, I have had to deal with the pain and anger related to being cheated by Steve Farr. For the most part it is gone. But seeing him have "toys" that he really shouldn't be able to afford if he were paying people back brings some old feelings to the surface.

(Email, May 20, 2020, Ex. A to Gov't Resp. Mot. Quash, ECF No. 123-1.)

Prompted by this email, and after looking into the status of Mr. Farr's restitution payments, the United States determined that its decision to stop collecting payments in 2011 was an error. The government sent Mr. Farr a letter dated May 21, 2020, in which it explained the mistake and asked Mr. Farr to "agree to an installment payment order based upon [his] current financial situation." (Letter from Allison Moon to Steven Farr, May 21, 2020, Ex. A to Mot. Order Show Cause, ECF No. 65-1 at 19–20.) The government then served Mr. Farr with a subpoena on August 26, 2020, asking for financial statements and other documents related to the boat that had prompted the victim's email. (Subpoena to Steven Farr, Aug. 26, 2020, Ex. A to Mot. Order Show Cause, ECF No. 65-1 at 7–16.) Mr. Farr disputed that the restitution order remained valid and objected to the subpoena. (Obj. to Subpoena, Sept. 30, 2020, Ex. A to Mot. Order Show Cause, ECF No. 65-1 at 2–6.) As a result, the United States filed a motion for an order to show cause asking the court to declare the validity of the restitution order and directing Mr. Farr to respond to the subpoena. (Mot. Order Show Cause, ECF No. 65.)

That motion prompted several years of litigation, which was prolonged in part because of Mr. Farr's health. (See Order Granting Stip. Mot. Extend Time, Dec. 18, 2020, ECF No. 69; Not. Update Regarding Def.'s Health Condition, Feb. 1, 2021, ECF No. 71.) After a status conference on May 2, 2023, the court referred the motion to Magistrate Judge Dustin B. Pead. Judge Pead issued a Report and Recommendations (R&R) in which he found that the restitution order remained valid despite the government's missteps. (R&R, July 26, 2023, ECF No. 94 at 7.) The court adopted the R&R over Mr. Farr's objections and held that, despite the government's citation to the incorrect statute in the plea agreement, the court nevertheless "had the authority to order restitution under 18 U.S.C. § 3663(a)(3) and, under 18 U.S.C. § 3613, the restitution order remains in force until January 23, 2028."[2] (Order Adopting R&R, June 25, 2024, ECF No. 100 at 6–7.) The court then ordered Mr. Farr to respond to the subpoena and provide the requested financial information. (Id. at 8–9.)

The United States filed a second motion for an order to show cause alleging that Mr. Farr failed to comply with the court's order. (Second Mot. Order Show Cause, ECF No. 102.) Judge Pead held a series of hearings and denied the motion after he found that Mr. Farr eventually demonstrated substantial compliance with the subpoena. (Min. Entry, Aug. 5, 2024, ECF No. 107; Min. Entry, Aug. 22, 2024, ECF No. 110; Min. Entry, Sept. 3, 2024, ECF No. 113.)

---

[2] "[An] order of restitution made pursuant to [§ 3663] shall be issued and enforced in accordance with section 3664." 18 U.S.C. § 3663(d). Section 3664(m), in turn, provides: "An order of restitution may be enforced by the United States in the manner provided for in subchapter C of chapter 227 and subchapter B of chapter 229 of this title." 18 U.S.C. § 3664(m)(1)(A)(i). Finally, § 3613, which is contained within subchapter B of chapter 229, states that "[t]he liability to pay a fine shall terminate the later of 20 years from the entry of judgment or 20 years after the release from imprisonment of the person fined[,]" 18 U.S.C. § 3613(b), and further affirms that "all provisions of this section are available to the United States for the enforcement of an order of restitution." 18 U.S.C. § 3613(f). Mr. Farr was released from imprisonment on January 23, 2008. (See Gov't Resp. re: Expiration of Restitution Order, ECF No. 99 at 2.)

4

But Mr. Farr's responses to the subpoena, as well as arguments he made about his wife's responsibility for many of the couple's household expenses, raised additional concerns for the government as it attempted to gain a complete picture of Mr. Farr's finances.

The government sought more information in five areas. First, the United States issued a subpoena to Native Rayz LLC (Native Rayz) on August 15, 2024. (Subpoena to Native Rayz, Ex. A to Tammy Farr's Mot. Quash, ECF No. 117-1 at 6–9.) Native Rayz is a limited liability company whose sole member is Mrs. Farr and whose assets include the boat that initiated the renewed interest in Mr. Farr's restitution, a 2019 Tige R23 purchased for approximately $100,000, and two motorcycles. (Hr'g Tr., Nov. 19, 2024, ECF No. 150 at 42; Boat Listing, Ex. C to Gov't Resp. Mot. Quash, ECF No. 123-3 at 3–4; Title Certificate, Ex. H to Gov't Resp. Mot. Quash, ECF No. 123-8; ECF No. 159 at 3.) Also on August 15, 2024, the United States issued a subpoena to Sunrise Trust (the Trust). (Subpoena to Sunrise Trust, Ex. A to Tammy Farr's Mot. Quash, ECF No. 117-1 at 2–5.) The Trust's assets include the joint residence at which the Farrs reside, but which Mrs. Farr alleges is her sole property. (Hr'g Tr. at 42–43; Sunrise Trust, Ex. G to Gov't Resp. Mot. Quash, ECF No. 123-7.) Third, the United States issued a subpoena to Mrs. Farr on September 3, 2024, asking for documents related to Mrs. Farr's finances. (Subpoena to Tammy Farr, Ex. A to Tammy Farr's Mot. Quash, ECF No. 117-1 at 10–13.) Fourth, the government issued an additional subpoena to Mr. Farr on September 9, 2024, asking for financial documents stretching back to 2005. (Subpoena to Steven Farr, Ex. A to Mot. Quash, ECF No. 116-1.) Finally, the United States issued a subpoena to Sekoya Reserve, a sole proprietorship owned and operated by Mr. Farr. (Subpoena to Sekoya Reserve, Ex. C to Gov't Resp. Sekoya Mot. Quash, ECF No. 132-3.) In his disclosures responding to the first subpoena, Mr. Farr listed a monthly income of $6,234 ($5,101 in wages and $1,133 in net

business income) and stated that the Sekoya Reserve had $332,000 in inventory (as well as $15,000 in inventory purchased but not yet received).  (Financial Statement Form, Ex. A to Gov't Resp. Sekoya Mot. Quash, ECF No. 132-1.)

The Farrs filed several motions relating to these subpoenas.  Mr. Farr filed a motion to quash the subpoena addressed to him.  (ECF No. 116.)  He later filed an additional motion to quash the subpoena addressed to Sekoya Reserve.  (ECF No. 127.)  Finally, Mrs. Farr filed a motion to quash the subpoenas addressed to her, Native Rayz, and the Trust.  (ECF No. 117.)

At two hearings on these motions, on November 19, 2024, and November 22, 2024 (Min. Entries, ECF Nos. 135 & 138) Judge Pead found that the government could appropriately ask the Farrs about the majority of assets at issue, including Sekoya Reserve.  (ECF No. 150 at 57–58.)  But Judge Pead did put some limits on the government's requests.  Most notably, he disagreed with the government that it could seek records of all stocks, securities, and bonds bought and sold by Mr. Farr since 2005.  (Id. at 59.)  Instead, he limited that discovery to transactions that occurred since January 1, 2020.  (Id.)  He found that date appropriate because it was relevant to "the state of mind of Mr. Farr" in the months before Mr. Farr received the government's May 21, 2020 letter.  (Id. at 60.)  Judge Pead noted that "there may be documents that reflect transfer of assets or availability of assets as of January 1, 2020."  (Id.)

The Farrs objected to several aspects of Judge Pead's rulings.  But after careful consideration of those objections, the court held that they were without merit and overruled them.  (ECF No. 154 at 14–16, 18.)  The court also found that further discovery or motion practice would not be helpful given the lengthy delays in this matter.  (Id. at 18.)  Instead, the court ordered the Farrs to respond to the subpoenas within 14 days and ordered the United States

to file a status report after receiving those responses detailing whether the United States believed that the Farrs had complied. (Id.)

In its status report (ECF No. 156), the United States argued that while the Farrs had provided many responsive documents, there were several items that were still missing or incomplete. (ECF No. 156 at 1.) After reviewing the government's report, the court agreed that the Farrs had yet to achieve substantial compliance with the court's February 14, 2025 order:

> The court is especially concerned that Mr. Farr has not provided adequate documentation of his brokerage accounts, the forms associated with his tax returns, and the financial records from Sekoya Reserve. For her part, Ms. Farr has failed to provide requested bank statements and documentation of bonuses and commissions.

(Order, Mar. 17, 2025, ECF No. 157 at 1.) The court then provided the parties an additional 30 days to complete discovery and determine an appropriate repayment plan. (Id. at 2.)

The parties were unable to agree on such a plan and instead submitted simultaneous briefs outlining their proposed payment plans. (ECF No. 159; Def.'s Proposed Plan, ECF No. 162.) The United States asks the court to order Mr. Farr to pay $2,000 per month towards his restitution judgement. (ECF No. 159 at 1.) The United States further requests that the court appoint a receiver to divest Mr. Farr of the inventory and assets at Sekoya Reserve. (Id.) Mr. Farr opposes the government's request to appoint a receiver. (Def.'s Request to File Resp., ECF No. 164.) Furthermore, Mr. Farr argues that he can pay at most $850 per month towards his restitution judgment. (ECF No. 162 at 2.)

## LEGAL STANDARD

The statute governing the procedure for the issuance and enforcement of an order of restitution is 18 U.S.C. § 3664. First, the court determines the amount of restitution owed: "In each order of restitution, the court shall order restitution to each victim in the full amount of each

7

victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." Id. § 3664(f)(1)(A). Any dispute about this amount shall be resolved by the court by the preponderance of the evidence and "[t]he burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government." Id. § 3664(e).

After determining the amount of restitution owed, the statute permits the court wide latitude in structuring how a defendant must pay that restitution. For instance, the court may "direct the defendant to make a single, lump-sum payment, partial payments at specified intervals, in-kind payments, or a combination of payments at specified intervals and in-kind payments." Id. § 3664(f)(3)(A). But the court must consider the defendant's financial circumstances when determining an appropriate repayment plan. See id. § 3664(f)(2); see also United States v. Wilson, 416 F.3d 1164, 1170 (10th Cir. 2005) ("The defendant's economic circumstances are relevant in fixing a payment schedule."). Specifically, the statute instructs the court to consider:

> (A) the financial resources and other assets of the defendant, including whether any of these assets are jointly controlled;
>
> (B) projected earnings and other income of the defendant; and
>
> (C) any financial obligations of the defendant, including obligations to dependents.

18 U.S.C. § 3664(f)(2).

To allow the court to assess the defendant's financial circumstances, the statute requires the defendant to

> prepare and file with the probation officer an affidavit fully describing the financial resources of the defendant, including a complete listing of all assets owned or controlled by the defendant as of the date on which the defendant was arrested, the financial needs and earning ability of the defendant and the

8

> defendant's dependents, and such other information that the court requires related to such other factors as the court deems appropriate.

Id. § 3664(d)(3). "The burden of demonstrating the financial resources of the defendant and the financial needs of the defendant's dependents, shall be on the defendant." Id. § 3664(e).

The statute also allows the court to adjust a defendant's payment schedule after it has been notified[3] of a change in the defendant's economic circumstances: "Upon receipt of the notification, the court may, on its own motion, or the motion of any party, including the victim, adjust the payment schedule, or require immediate payment in full, as the interests of justice require." Id. § 3664(k).

## ANALYSIS

The parties have proposed vastly different repayment plans. Mr. Farr argues that the maximum he and his wife can afford while meeting their basic living expenses is $850. (ECF No. 162 at 2.) In contrast, the United States asks the court to impose a monthly payment of $2,000 while also appointing a receiver to liquidate Sekoya Reserve's inventory, which is valued at more than $300,000. (ECF No. 159 at 4–5.) The government notes that its monthly payment request "assumes the appointment of a receiver to dissolve Sekoya Reserve and does not include [Mr. Farr's] self-reported monthly draws from Sekoya Reserve." (Id. at 10.)

The court finds that neither plan adequately accounts for Mr. Farr's financial resources. The parties do not dispute that Mr. Farr receives a monthly income of $6,234. (See Fin. Statement, ECF No. 123-4 at 6.) Of this income, $5,101 comes from Sisel International, a multi-level marketing company that sells home health care products. (Id.; ECF No. 162 at 8.) The

---

[3] The defendant is required to notify the court and the Attorney General of any material change in their economic circumstances, but "the court may also accept notification of a material change in the defendant's economic circumstances from the United States or from the victim." 18 U.S.C. § 3664(k).

remaining $1,133 comes from Mr. Farr's self-reported draws from Sekoya Reserve, which is operated by Mr. Farr and his wife and trades in precious metals. (ECF No. 123-4 at 6; ECF No. 162 at 8.) In addition, Mr. Farr reports that his wife makes $6,117 a month, yielding a joint income of $11,550. (ECF No. 123-4 at 6.)

The Farrs report monthly expenses of $10,389.55. (Id.) Accordingly, based solely on their own reporting, the Farrs have excess monthly income of $1,160.45. Even before examining other factors, Mr. Farr's suggested payment plan of $850 is below the amount that it appears he can afford. The Farrs also own significant assets, including: 1) a house, purchased and owned by Mrs. Farr in 2008, for which the Farrs cite mortgage payments of $2,998 per month (see ECF No. 162 at 6); the 2019 Tige R23 boat, which the Farrs assert now has an approximate value of $40,000 to $60,000 (see id. at 5) but which the Farrs purchased for $100,000 (see ECF No. 149 at 3); 3) Sekoya Reserve, which owns $332,000 in inventory, as well as $15,000 in inventory purchased but not yet received (see ECF No. 132-1); and 4) various bank accounts.

Nevertheless, Mr. Farr points out that the Farrs also face significant debt. He estimates monthly payments of $2,071 to pay off credit card debt, $770 on a vehicle loan, and $850 to pay the IRS under a payment plan for over $70,000 in past and current taxes. (ECF No. 162 at 5–6.) Mr. Farr also notes significant health issues, including the open-heart surgery in 2021 that delayed resolution of this matter. (Id. at 7.) He argues that he cannot afford health insurance. (Id.) Finally, Mr. Farr maintains that he has been unable to maintain regular full-time employment, in part due to his medical conditions and his previous felony conviction. (Id.) He relies on his income from Sisel International and Sekoya Reserve. (Id.)

The court finds that, despite extensive document production, discovery requests, and litigation over those requests, there remain several mysteries concerning the Farrs' finances.

First, it is unclear whether the Farrs have disclosed information about all their bank accounts. For instance, the Farrs' joint tax returns disclose capital gains and losses from the sale of stocks in an Ameritrade brokerage account listed in Mrs. Farr's name. (See Tammy Farr Suppl. Disclosures, ECF No. 162-6 at 114–44.) But the court has seen no account statements or other evidence that indicates the value of Mrs. Farr's stock portfolio. And tax information about the gain or loss of value incurred when Mrs. Farr sold various stocks is insufficient to indicate the total value of assets in the account.

Second, the Farrs have not adequately explained the income they derive from Sekoya Reserve. Mr. Farr asserts that the company has a gross profit between $1,000 to $2,000 each month, but that the profit varies drastically. (ECF No. 162 at 8.) But the government suggests that Mr. Farr is able to draw additional funds from the business's bank account when he desires. (ECF No. 159 at 4.) And although the court agrees that the liquidation of Sekoya Reserve's inventory would put the company out of business, it appears that the Farrs could sell off some of the company's inventory—which, after all, consists of precious metals—without ending the business. While such an act might delay the opening of a brick-and-mortar store, which Mr. Farr hopes to achieve (see ECF No. 162 at 8), there is no evidence to suggest that he could not draw some additional funds from his business to help pay his restitution debt.

Finally, the Farrs have not provided any evidence about the agreement they reached with the IRS to settle their tax debt. The government notes that this debt of around $70,000 is self-reported by Mr. Farr and that the Farrs apparently entered the IRS settlement without consulting with the U.S. Attorney's Office—thereby prioritizing their obligations to American taxpayers in general over Mr. Farr's more specific restitution obligations to the victims of his crime. (ECF No. 159 at 4.) In addition, the government points out that the tax obligation is shared by the

11

Farrs jointly, and that therefore Mrs. Farr may satisfy this tax obligation with her independent and separate assets, such as funds in the Sand Dollar Trust, which contained $78,044 in February 2024 and of which she is a beneficiary. (Id. at 5 n.2.) Finally, the Farrs' failure to pay taxes either at the same time or shortly after they bought a luxury boat is not exactly a mark in their favor.

These concerns do not imply that the Farrs have failed to show substantial compliance with the discovery requests issued by the government. Indeed, the court will not require the Farrs to produce additional documents to avoid a finding of contempt for failure to respond to the government's subpoenas. But these subpoenas are simply the tools the government uses to collect sufficient financial information to propose a payment schedule.[4] Regardless of the discovery requests made by the government, it is ultimately a defendant's burden to demonstrate to the court why he or she should not be ordered to pay the full restitution amount. After all, "[t]he burden of demonstrating the financial resources of the defendant and the financial needs of the defendant's dependents, shall be on the defendant" when the court first sets a restitution payment plan. 18 U.S.C. § 3664(e). And the court finds no indication that this burden is shifted after the government has demonstrated a material change in the defendant's circumstances and

---

[4] To collect restitution debts, the United States must act "in accordance with the practices and procedures for the enforcement of a civil judgment under Federal law or State law." 18 U.S.C. § 3613(a). The Federal Debt Collection Procedures Act (FDCPA), 28 U.S.C. §§ 3001–15, provides the "exclusive civil procedures for the United States to recover a judgment on a debt[.]" 28 U.S.C. § 3001(a). The FDCPA authorizes the United States to "have discovery regarding the financial condition of the debtor in the manner in which discovery is authorized by the Federal Rules of Civil Procedure in an action on a claim for a debt." 28 U.S.C. § 3015(a). The Federal Rules of Civil Procedure, in turn, authorize a judgment creditor to obtain discovery from a judgment debtor, see Fed. R. Civ. P. 69(a)(2), and to issue subpoenas commanding a party to produce documents and other information. See Fed. R. Civ. P. 45(a)(1)(D). Rule 45 further provides that the court "may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it." Fed. R. Civ. P. 45(g).

the court is considering an amended payment plan. See 18 U.S.C. § 3664(k). To the extent Mr. Farr seeks to avoid immediate payment in full of the outstanding restitution amount, it is Mr. Farr who must demonstrate why he would be unable to pay such an amount.[5]

The court therefore finds that it has the authority to conduct additional fact-finding concerning the financial questions it has raised. But given the unique circumstances of this case, the court is not inclined to hold further proceedings. Although the court has previously held that the government cannot be estopped from enforcing the court's restitution judgment against Mr. Farr (see ECF No. 100 at 7), the court recognizes that Mr. Farr is not at fault for the government's failure to request restitution payments for nearly a decade, and that the government's discovery of its error has resulted in an unwelcome financial surprise for the Farrs at a time when Mr. Farr faces significant health issues and reduced future earning prospects. Given these considerations, the court finds that it is appropriate to give the Farrs the benefit of the doubt concerning whether additional assets exist and whether Mr. Farr could liquidate a portion of his business to pay a larger percentage of his restitution debt. Should Mr. Farr default on the payment schedule the court sets forth below, the court may conduct further inquiry into the Farrs' finances. See 18 U.S.C. § 3613A(a)(1) (permitting the court to "take any other action necessary to obtain compliance with the order of … restitution" upon a finding that a defendant is in default on a restitution payment).

Having carefully weighed the evidence that <u>has</u> been produced in this matter, the court finds that a payment plan of $2,000 per month adequately accounts for Mr. Farr's financial circumstances while still providing a meaningful repayment of his restitution obligation. As the

---

[5] The court notes that it may sometimes simplify contentious restitution disputes to hold an evidentiary hearing in an appropriate case rather than to rely solely on discovery responses—and the threat of contempt for failing to respond to those responses—provided to the government.

parties well understand, the restitution order against Mr. Farr only remains valid until January 23, 2028. Under the court's schedule, Mr. Farr will therefore pay an additional $48,000 toward his restitution debt, the first of these payments to be made on March 1, 2026, and the final two payments to be made on January 1, 2028, and January 22, 2028. Combined with the money that Mr. Farr has already paid toward restitution, this amount represents only about 5% of his $1.3 million restitution obligation. But it is helpful to compare this amount to the amount that Mr. Farr should have been paying over a 20-year period if the government had not failed to enforce his restitution order for so long. To pay off his $1,313,914.77 debt over 20 years (assuming no interest), Mr. Farr would have had to make monthly payments of $5,475. The court's payment schedule requires him to pay over a third of this monthly payment, which represents a meaningful effort to give the victims of his crime some justice even at this late stage.

The court's payment schedule is also significantly higher than the monthly payments of $850 requested by Mr. Farr. But the court finds that the order accounts for Mr. Farr's financial circumstances for several reasons. First, the court has noted that it is skeptical of the tax settlement the Farrs reached with the IRS. This settlement was reached without any consultation with the U.S. Attorney's Office, and—because it is a joint obligation—it may be paid with assets that are solely owned by Mrs. Farr, such as the money in the Sand Dollar Trust. The court therefore disregards the $850 monthly obligation to the IRS cited by Mr. Farr. And as the court has noted, the Farrs have reported $1,160.45 in excess monthly income after factoring in expenses. Removing the IRS obligation, that amount rises above $2,000, thereby supporting the court's proposed payment plan.

Second, the court has considered that the restitution obligation only remains valid for another two years. Resolution of this matter has taken nearly six years, as the government first

14

notified Mr. Farr of his continuing restitution obligation on May 21, 2020. All parties, including the court (who has had to juggle this matter with a busy trial schedule and, most recently, the government shutdown), have contributed to delays. But Mr. Farr should not benefit from his part in those delays, especially from the delays resulting from objections to Judge Pead's rulings—all of which this court eventually overruled. If Mr. Farr had been paying according to his proposed schedule of $850 per month for just half the time this litigation has been pending (and for the remaining two years that the restitution order is valid), he would have been able to pay off about $50,000 of his debt, which is approximately the amount the court orders.

Third, the court notes that the $48,000 ordered under the court's payment schedule is well within the level of expenses the Farrs have considered reasonable in the past, including a home equity line of credit for $45,600 and the $100,000 purchase of the boat. And finally, speaking of the boat, Mr. Farr himself acknowledges that the boat has an approximate resale value of $40,000 to $60,000. This matter began with the Farrs' boat purchase and the resulting frustration that purchase caused for one of the victims of Mr. Farr's crime. The court finds it fitting that Mr. Farr should repay at least the current value of that boat as a meaningful way to provide some relief to that victim and others.

The court is not persuaded by the government's suggestion that Mr. Farr should be held to a more aggressive repayment plan by imposing a receivership on his business at this time. As the court has suggested, Mr. Farr may need to sell some of Sekoya Reserve's inventory to comply with the court's payment schedule. But imposing a receivership on the business would prevent further profits, thereby removing one of the primary means by which Mr. Farr will fulfill his monthly payments. And although a receiver could liquidate Sekoya Reserve's inventory, it is not clear that, after accounting for the administrative expenses that would go to the receiver, a

liquidation of the business would result in substantially more relief for Mr. Farr's victims than the court's proposed schedule. In addition, the court retains the option of appointing a receiver should Mr. Farr be unable to comply with the payment schedule ordered here.

## ORDER

For the foregoing reasons, the court ORDERS as follows:

1.  The court GRANTS the government's Motion for Installment Payment. (ECF No. 159.) Mr. Farr is ordered to make payments on his outstanding restitution debt as follows: 24 payments of $2,000 per month, with the first payment to be made by March 1, 2026, and the final two payments to be made on January 1, 2028, and January 22, 2028.

2.  The court DENIES WITHOUT PREJUDICE the government's motion to appoint a receiver. (ECF No. 159.)

DATED this 3rd day of February, 2026.

BY THE COURT:

*Tena Campbell*
Tena Campbell
United States District Judge